Bertram Harnett, J.
Implicit in the resolution of disputes between partners must be the special responsibilities partners bear to . each other. In connection with their partnership affairs, they bear a fiduciary relationship to each other. This means in their intramural dealings they cannot fall back on the morals of the marketplace. (Meinhard v Salmon, 249 NY 458, 463.) This means there is no place for misguided paternalism. This means that one cannot act too quickly to protect his own financial position at the expense of his partners, even if the actor is without malice. There must be full disclosure of receipts and advantages before a partner, acting as a liquidating or selling partner, can safely bargain with his fellows upon their partnership dissolution.
Sidney Estridge’s failure to take this into account in disposing of his incongruous venture with David Auld and Milton Stark forms the core of this case.
In reality, this is another of those cases which may be fairly called business matrimonial disputes. Three partners entered into business high in hope, and left it three years later deep in recrimination. Stripping away the husk of recurrent com *897 plaint, the parries and ripostes of selfserving letters, the righteous protestations, and the horde of fragmentary issues, we come to a simply stated question. What is the proper valuation and division of the corporate stock received in exchange for the partnership business?
Let us look.
I. THE FACTS OF THE CASE
On August 19, 1965, Auld, Stark, and Kenway Metals Corporation associated in the woodworking business under an agreement which Estridge, Kenway’s principal, and a nonpractising lawyer, had drafted. By its terms, Auld would provide woodworking skills and production in Haiti, where he was long established. Stark would provide salesmanship, and Kenway would provide necessary financing. The nominal ownership of the business was in Kenway, which carried it as its David Auld Woodworking Division. Kenway handled the record keeping and administration.
Sidney Estridge signed the agreement, on behalf of Kenway Metals Corp., and not strictly as an individual. But, Estridge, the president and sole stockholder of Kenway, used his individual and corporate identities interchangeably. In this case, he personally seeks reimbursement for money which Kenway advanced to the venture, and it is Estridge’s personal misbehavior that is the basis for this suit. No corporate cloak can justifiably veil Estridge from his involvement here, nor does he seek its shelter.
The parties refer to their association as a joint venture. Their agreement calls it a "venture.” Whether characterized as a venture, joint venture, or a partnership, for legal purposes the form is a partnership. (See Partnership Law, § 10; Mechem, The Law of Joint Adventures, 15 Minn L Rev 644.)
By early 1968, it became apparent that the partnership was not succeeding. There were mounting mutual accusations and complaints about production, sales, and financing. Estridge, who was plainly the leader, took it on himself to find a buyer for the business.
Ultimately, on June 7, 1968, he exchanged the woodworking business for 60,000 shares of the unregistered stock of an unrelated company, Allen Electronic Industries, Inc. Because of securities law regulation, this Allen stock was restricted in its salability and not subject to public distribution. One week *898 later, he received by way of spin-off on the Allen stock, 60,000 shares of freely tradable stock of Calculator Computer Leasing Corp. He was able to do this all unilaterally because the woodworking business assets were wholly within Kenway, his corporation.
To accomplish the actual transaction, he resorted to some remarkable corporate sleight of hand. He formed a new corporation called Kenmet and transferred to it most of the non-Woodworking Division assets. Then he changed the name of the corporation Kenmet to Kenway, and the corporation Kenway to Kenmet. By all of this, the woodworking business plus some miscellaneous assets (presumably to base a usable tax loss) wound up as the total holding of the old Kenway, now Kenmet, which was actually exchanged for the Allen stock. (The old corporation is referred to as "Kenway” throughout this opinion.)
On July 25, 1968, Estridge met with Auld in New York. The testimony varied in the recount of that meeting and the events of the day after, but the court believes that the following took place. Estridge told Auld, who was not represented by counsel, that he had made a good deal. He told Auld he had gotten some shares of Allen and that Auld’s share was 5,000 of the shares of stock in Allen. Auld said he knew nothing of stock, he wanted cash. Estridge assured him the stock was worth $25,000, which he would get for him. Auld thereupon signed a general release. The next day, when Auld came for his money, Estridge said he could not raise the $25,000, but could raise $12,000 with the balance to be forthcoming when the stock was sold. Later in that sequence, Estridge retreated again and said he could not raise even the $12,000, and that Auld would have to be content with the 5,000 shares. Auld remonstrated that he badly needed cash, indeed, he could not return to Haiti without some. Estridge asked if $10,000 would be acceptable, and when Auld agreed, Estridge arranged a loan at his own bank for Auld which he guaranteed. The 5,000 shares of restricted Allen stock were posted as collateral. Auld got the $10,000, eventually repaid $2,000 and defaulted as to the balance. Estridge as guarantor paid the $8,000 balance plus $547.33 interest and took over the 5,000 Allen shares. Apparently, this describes Auld’s entire receipt from Estridge for his interest in the David Auld Woodworking Division dealt in corporate package to Allen.
There was, however, one relevant postscript to these events. *899 By December, 1968, Auld had found out about the full 60,000 Allen shares, the 60,000 shares of Calculator Computer Leasing Corp., and three subsequent spin-offs, occurring months later, on the Allen and Calculator Computer stock. Early in 1969, another unrelated company, Newport Chemical Industries, wanted to acquire the woodworking business, and was trying to resolve Auld’s plaint with the initial sale. Newport’s agents apparently persuaded Auld to give up his claim against Estridge in exchange for additional shares of stock. This was written into an agreement which was to be held in escrow until the stock was delivered to Auld. However, this transaction was never completed. When Auld appeared to receive his certificates, he was informed that an additional condition of this settlement was that he pay $9,000 Estridge claimed he owed. He also found some of the promised stock to be missing, and thereupon walked out on the "settlement”.
Now Auld sues Estridge with a spray of fraud and bad conduct allegations. He claims he should have gotten much more than he did on the Allen exchange. Estridge responds that he had made advances to the partnership which, when credited for repayment, wiped out Auld’s values completely, and that his 5,000 share tender to Auld was really a gratuity. Auld countered that under the agreement he was to get one third of all liquidation proceeds, and that covered the Allen stock. He claims 20,000 shares of Allen, 20,000 shares of Computer Calculator Leasing, and one third of the three added spin-off shares. He also implies that the amount of advances claimed by Estridge is inflated and Estridge in turn implies that Auld was improperly milking the enterprise. Actually, Estridge counterclaims only for the $8,547.33 he paid to the bank.
II. A FORMAL SUIT FOR ACCOUNTING IS NOT A CONDITION
PRECEDENT WHERE ALL PARTIES ARE OR CAN BE REASONABLY AND FAIRLY BEFORE THE COURT AND NO PRACTICAL ISSUE APPEARS AS TO THE PARTNERSHIP ACCOUNTS.
In procedural defense, Estridge urges at the beginning that Auld must first sue for a partnership accounting before he can assess Estridge. He points out Auld has failed to ask for an accounting here, and has failed to join Stark as a party.
The apparent rule which Estridge seeks to invoke is that where one partner wishes to sue another for acts within the partnership context, there must first be a full partnership *900 accounting with all partners joined. (Arnold v Arnold, 90 NY 580; Bankers Trust Co. v Dennis, 256 App Div 495, affd 282 NY 635.) This is so that a net balance of all net assets and outstanding partnership claims are dealt with, and no premature awards are made which require later adjustment. Moreover, the litigative presence of all partners will preclude the risks inherent in multiple litigation of similar issues.
Estridge, however, misconceives the cast of this case. The partnership is over here; it was sold in its entirety and a fund of stock realized in its stead. There are no practical questions of its accounts. Only four questions remain. They are: (1) Estridge’s authorization to act in dealing the partnership business to Allen; (2) application and legal interpretation of the partnership agreement of the parties; (3) Estridge’s attempted allocation of the fund to disposition of nonpartnership assets; and (4) effect of actual conduct by the parties before, during, and after the disposition, with respect to dividing the proceeds. This last point raises questions of fraud or improper fiduciary dealing on the part of Estridge.
None of these points requires a formal partnership accounting. The partnership affairs are really settled and this suit is for impropriety in distributing the fund which was properly acquired in replacement of the partnership. (See 1 Cavitch, Business Organizations, §§ 20.04[9], 20.04[9], subd [b].)
Actually, by the court’s findings the ostensible accounting questions of debts between the partners all fall away entirely. On trial, Auld insinuated, but failed to prove any claim for uncollected rent, salaries, expenses, or anything except his share of the exchanged stock. Nor has Auld here upset in any significant way the presumptive regularity (Rathbone v Ayer, 196 NY 503, revg 121 App Div 355, 365), in the regular and previously unchallenged accounts of the business of the entries for $117,614.14 in advances as contended by Estridge. (The interest on that is a separate legal point to be discussed below.) Estridge raised fuzzy issues on trial implying Auld’s misappropriation, but he never pleaded them or pursued them seriously. His own constant control of the money flow and the financial records obviously doomed the fruitfulness of this inquiry. The maneuver seemed more tactical than anything else. Moreover, Estridge’s claim to allocate all or part of the Allen proceeds to a Kenway tax loss from nonpartnership activities was demonstrably not part of the partnership account. Even then the tax loss was utterly unproven, both with *901 respect to its existence as a bargained for consideration, and with respect to its worth. The proof failed as to the aging of the net operating loss deduction carryovers and carrybacks (see US Code, tit 26, Internal Revenue Code, § 172, subd [b]), as well as the usability of the tax loss to Allen in the context of existing tax laws relating to business purpose of continuity. (See Internal Revenue Code, §§ 381, 382.)
Because of the sophisticated nature of the assets obtained by Estridge personally, the differences in investment and cash needs of the parties, and the diverse personal relationships, there is no necessary identity of settlement interest for the various partners. The yield was all over-the-counter stock, some of it restricted, and it could represent different quantities to different people. Auld could make one deal with Estridge, and Stark another. Auld has interests and rights of his own to assert in any settlement he makes with Estridge, and can sue if aggrieved without involving Stark.
There is another factor which is most pertinent. We observe, as we do often, that a lawsuit is not a game. It is a serious enterprise dedicated to the resolution of grievances and the discharge of social tension. The requirement of accounting,. where applicable, is a judicial and not a statutory rule. It was meant to expedite the total settlement of disputes, not hinder them. (Burleigh v Bevin, 22 Misc 38, 40.) No purpose of justice is served by delaying the resolution here on empty procedural grounds.
Whatever the procedural synthesis of cases marching in from the past, in this case the issues and the parties were fully and fairly before the court and each other. Stark, while not a party, testified in court personally. The court was led by the parties to believe he had a separate suit pending against Estridge. If Estridge were so concerned about prejudice in procedure, he could have counterclaimed for an accounting (Nussenblatt v Nussenblatt, 62 Misc 2d 792), he could have moved to join or consolidate Stark’s cause (Philip Shlansky & Bro., Inc. v Grossman, 273 App Div 544), he could have resorted to third-party practice. In fact, no one has demonstrated any prejudice. In essence, the parties have had their accounting before this court, to the extent one was needed.
The effective issues that Auld raises against Estridge are personal between them. To the extent the specter of later suit by Stark hangs over Estridge, he must be deemed to accept these as a calculated risk in foregoing the ameliorative oppor *902 tunities open to him, The plaintiff has the burden of proof, but a defendant in an equitable cause has burdens of his own.
III. ESTRIDGE FAILS IN HIS FIDUCIARY DUTY TO HIS PARTNER
The court finds Estridge breached his fiduciary duty to his partner Auld.
The court has no doubt Auld knew or should have known Estridge was dealing to dispose of the business. While he may not have known specifications, he entrusted Estridge with those affairs. The gist of Auld’s complaint is in what he got out of the deal, not in the deal itself.
Auld feels betrayed by his partner Estridge. A partner has a special obligation of undivided loyalty to his partners — quite different from an obligation owed to strangers. (Schneider v Brenner, 134 Misc 449.) For Estridge, who alone was managing the sale of the business, this burden was particularly great. (Corr v Hoffman, 256 NY 254.) He was under a duty to disclose to his partners information uniquely his, which was fundamental to their enterprise. (Meinhard v Salmon, 249 NY 458, 463, supra; Schneider v Brenner, supra.) In the end, nothing was more fundamental or basic to Auld’s interest in the business than the price for which it was sold. Yet, Estridge was misleadingly silent here.
The classic statement of Chief Judge Cardozo in Meinhard (supra), rings sonorously through the archives of this case, where he proclaimed that nonfraudulent conduct alone is not sufficient between partners, not the morals of the marketplace, "[n]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.” (249 NY 458, 464.)
Estridge fell far far short of this standard. His concealment of the total Allen share payment and the 60,000 share Computer Calculator Leasing dividend was inexcusable. In view of their relationship and the existing circumstances, Auld had the right to rely on Estridge’s assurance that he was getting his share. Estridge, on the other hand, had the duty to disclose fully to Auld, including the valuations and the amount of the setoff advance he was using. (Mitchell v Reed, 61 NY 123; Kelly v Delaney, 136 App Div 604, affd 205 NY 618; Schneider v Brenner, 134 Misc 449, supra.)
The court sees the issue as simply that, and puts aside the welter of representations and misrepresentations and the like *903 argued by the parties at such great length. There seems to be no reason to squirm between the classic five fingers of fraud (Channel Master Corp. v Aluminium Ltd. Sales, 4 NY2d 403), to reach this resolution. The higher ground of partnership fiduciary duty is dispositive. (Cf Holmes v Gilman, 138 NY 369.)
IV, CONSTRUCTION OF THE AGREEMENT YIELDS 25% OF THE NET PROFIT TO AULD — THE ADVANCES ARE TO BE SET OFF IN DETERMINING PROFIT
We must now construe the partnership agreement to figure the formula for computing Auld’s share. Auld claims he was entitled to one third of the stock, as if it were liquidation proceeds. Estridge claims he is first entitled to return of his advances, which are the remaining unrecovered cost items, and only then is Auld entitled to one quarter as his share of the profit on the disposition.
Each relies on a different provision of the agreement to support his position. Paragraph 5, advanced by Estridge, provides: "The parties agree that they shall share in the profits of this venture known as a Division of Kenway Metals Corporation, in the following manner:
37 ¥2% to Kenway
37¥2% to Stark
25% to Auld.”
Paragraph 7, favored by Auld, provides: "In the event of any losses or in the event of the liquidation or the failure of the business, same shall be shared equally between the parties hereto.”
But, paragraph 3, which is specific, seems to control over the generality of paragraph 7. Paragraph 3, provides, in pertinent part: "Kenway will make available the sum of $5,000.00 for the purpose of buying machinery and making * * * constructural additions to the plant in Haiti for the purpose of conducting the business * * * Any additional financing that may be necessary for the furtherance of this woodworking business shall be at the discretion of Kenway * * * [T]he original fund of $5,000.00 made available by Kenway is to be repaid to it at the rate of 10% of gross sales plus 10% of all manufacturing costs. All additional funds arranged for by Kenway shall be repaid to it in the same manner.”
*904 It would appear to the court that Estridge’s position is more sound. Under paragraph 3, and the Partnership Law, as discussed below, the advance is recovered first. Then profit is to be considered under paragraph 5. Paragraph 7 is not meant to wipe out advances.
As we read the agreement and the law, first the advances are credited. Then, paragraph 5 takes care of the "up” side and paragraph 7 the "down” side. Since the disposition here was for a profit "of this venture,” and not a loss, it is paragraph 5 that controls. Auld is entitled to 25% of the venture profit. And, the size of that profit, and of Auld’s recovery, turns in part on Estridge’s right to recoup his advances.
Paragraph 3 establishes that Kenway’s advances were loans to be repaid and established a rate of repayment while the business continued. Nothing suggests that a sale of the business would wipe out the advances, or even that the advances were to be canceled when sales and manufacture ended.
Even where a partnership agreement is silent on contributed advances, subdivision 1 of section 40 of the Partnership Law provides that partners shall first recoup their contributions to the enterprise. (Gordon v Ginsberg, 22 AD2d 944.)
Accordingly, in any event, the net Kenway advances are to be deducted from any proceeds. Thereafter, the net profit or surplus proceeds are to be divided in accordance with the agreement.
The record establishes that Kenway advanced the partnership $117,614.14 which was not repaid. While Auld raised some question about the previous repayment of a portion of this amount, the inferences he asks the court to draw are not supported by the evidence.
Pursuant to subdivision 3 of section 40 of the Partnership Law, Estridge is entitled to interest on these advances until June 7, 1968 when his debt was satisfied in the sale transaction. (Levy v Leavitt, 257 NY 461.) The collectable interest on these advances comes to $8,423.77. In sum, Estridge was entitled to recover $126,037.91 from the proceeds of-liquidation.
V. VALUING LIGHTLY TRADED OVER-THE-COUNTER OR RESTRICTED STOCK IS NOT EASY, BUT IT CAN BE DONE
Now we have Auld entitled to one quarter of the fund less *905 credit to Estridge for $126,037.91. But, what is the dollar value of the fund? There is the most difficult question of the case. The others fall in with relative ease from the facts presented, the residual equities, and the governing precedents..
What was the Allen stock worth on June 7, 1968? What was the Computer Calculator stock worth at that same time? Can anyone really tell? In those at least temporarily bygone days, the pieces of paper predicting ownership in would-be great ventures enjoyed great currency. "Supermoney” was the word of one financial pundit who devoted a book to the use of such parchment. (Adam Smith, Supermoney, [Random House 1972].) Other less reverent, but no less informed, observers called it "funny money”. Whatever, it is at least clear that the free wheeling corporate strips of that day did have a market acceptability, despite the uncertainty of their underlying economic substance. There was, as there remains today to a lesser extent, an economic demand for shares in obscure economic entities of anticipated promise.
The over-the-counter market for unseasoned stocks is not the auction market of the exchanges, but rather a negotiated market. Any estimate of value of a large block to be sold publicly in any defined period must be an uncertain process. However, if seriously pursued, it can be done to some acceptable, if not precise, degree. Appraisers constantly act in estate proceedings, creditors and receivers marshall shares taken for debt, lenders work with valuation assumptions, as do business associates of all kinds in diverse redemption and buyout arrangements. (Cf Revenue Ruling 59-60, C.B. 1959-1, 237, amd Revenue Ruling 65-193, C.B. 1965-2, 370; Revenue Ruling 65-192, C.B. 1965-2, 259.) What was lacking here was the current will to act properly.
Estridge himself determined the potential and dealt with Auld on his own basis. Had he taken Auld into his full confidence, giving Auld a chance to be fully informed, the true worth of the Allen stock, as well as the Calculator Computer stock, might have been determined contemporaneously, when it could have been done. The fact that the Allen stock was unregistered and restricted, of course, severely crimped its value, but did not necessarily eliminate it. There are legitimate means of private placement of such stock and ways of getting restrictions lifted. Estridge’s story of not knowing when he made the Allen deal of the impending Calculator Computer stock dividend actually declared one week later is *906 simply too implausible to accept. At best, the course of conduct leading to it represents an indifference to reality which cries for chargeability. Estridge’s June 13, 1968 letter to Auld describing the Allen deal as pending when, in fact, it had closed on June 7, 1968, could be explained by backdating or closing delay. But, it could also have been a screen for his harvest of the Calculator Computer dividend.
The court does not accept Auld’s contention of his entitlement to further spin-off shares from the basic Allen and Calculator holdings. The court views Auld’s remedy as entitlement to a sum on the day Estridge bought him out. His case is basically a conversion type action, where he should have gotten certain values and did not. Instead, Estridge appropriated the shares to his own use and cashed them at his own pace. Auld wants the stock valued as if it were all sold promptly before its price dropped, but wants the benefit of dividends as if the stock were held off the market. He cannot have his remedy both ways. Nor can he hypothesize some theoretical maximum return achieved with a wizardry no one has. Either he gets off with the stock valued for prompt sale, or he rides the elevator down with Estridge.
Since it is now too late to test the market in any meaningful way, and since the trading tents have long been folded and the sands of years have covered the old grounds and guideposts, it is necessary to resort to more inexact but still probative means.
Estridge caused this situation, and he cannot now hold Auld to an impossible burden of proof. It is enough if Auld comes with proof convincing under the circumstances; Estridge has some positive rebutting duty of his own. If justice is fairness, as John Rawls philosophically suggests, it cannot be otherwise.
Auld put into evidence, with proper foundation, the reports of the National Quotation Bureau, quaintly called the "pink sheets,” in capitalist spheres. There is no doubt these are properly admissible as "market reports” under CPLR 4533 which reads: "A report of a regularly organized stock or commodity market published in a newspaper or periodical of general circulation or in an official publication or trade journal is admissible in evidence to prove the market price or value of any article regularly sold or dealt in on such market. The circumstances of the preparation of such a report may be shown to affect its weight, but they shall not affect its admissi *907 bility.” While admissible, they have only small probative force, since at best they represent a willingness to buy only one hundred shares of stock. But, even one hundred shares at a price is something, and at the bottom makes the difference between something and nothing.
Revenue Ruling 59-60, C.B. 1959-1, 237 lists as factors indicative of value the nature and history of the business, the economic outlook of the business and industry, the book value and financial condition, the earning and dividend paying capacities, the goodwill and intangibles, the sales of the stock and size of the block to be valued, and the market value in free and open market of companies in similar lines of business.
Estridge’s testimony was that Allen had good prospects and a sound seeming business; to him its economic outlook was good. Estridge wrote Auld as part of the build up on April 2, 1968 saying the Allen stock traded "during the past several months * * * between $4.50 and $9.00 per share.” Later he urged Auld the stock was worth $5 per share and was going higher. At that time, the whole Calculator Computer stock holding was within Allen.
The figures and knowledge of the Allen company advanced at trial by Estridge, who had become a substantial owner through the woodworking division sale, were inexplicably skimpy.
The most interesting and persuasive figures are in the actual sales of Calculator Computer stock made by Estridge. These were considerable and for large sums. Between November 6, 1968 and March 27, 1972, Estridge sold 30,250 shares of Calculator Computer for $117,325, an average price of almost $4 per share. His first sale was in November, 1968 for $3.25 per share and all subsequent sales in 1968, totaling 6,600 shares, were for over $5 per share. In January, 1969, sales started at $4 and tapered to $3. More than 23,000 shares were sold for $3 or more. In February, 1969, 5,000 shares were sold for $2.25 and in March, 1972, the market could still bring $1.75 per share for 2,000 shares. While hindsight is infallible in the marketplace, it is plain enough that, except for his attempts to maintain a price, Estridge could have fed out more stock earlier. Even if the remaining Calculator Computer shares were unsellable, Estridge still received an average of almost $2 per share for the whole 60,000 Calculator *908 share block just figuring the money he got for the stock he actually sold.
The record and Estridge’s own apparent competences must be taken to temper his recollection that he sold as much as he could as fast as he could. Since Estridge’s unilateral conduct precluded a more accurate appraisal, the court will rest with its own analysis, based on the actual sales record, and the surrounding facts and circumstances, that the 60,000 share block of Calculator Computer could have been relatively promptly liquidated in 1968 at not less than $2.75 per share. This conservative figure is accordingly adopted as the value per share.
As to the Allen stock, market sales are less helpful because of legal restrictions on the partnership’s shares. However, the stock was plainly worth something. After all, Estridge’s own story is that he swapped the whole woodworking business for only unregistered shares of Allen. Estridge himself opined the stock had values exceeding $4.50. No effort at all to sell the restricted Allen stock privately appears. Auld’s expert opined that such stock could be taken at 60% of market for financial statement purposes. On all the proof presented, the court opines that the Allen stock was worth no less than $1.25 per share, when received, and again for conservative holding, finds that sum to be its value.
Accordingly, the Allen stock is valued at $1.25 per share, the Calculator Computer at $2.75 per share. The total of each multiplied by 60,000 is $240,000. Subtracting the $126,037.91 advance and interest, $113,962.09 remains. Auld is entitled to 25% of that, or $28,490.52.
VI. THE “releases” ARE INFECTED BY ESTRIDGE’S FIDUCIARY BREACH AND HAVE NO VALIDITY
One further defense remains, and that is Estridge’s contention that Auld released him from liability on two separate occasions.
The first time he claims was on July 25, 1968. Auld executed a document releasing Estridge, Kenway Metals, and others from all liability arising from the joint venture.
But, this release is just another product of Estridge’s overreaching. Estridge, a lawyer, obtained this release from Auld who had no counsel in the same nondisclosure vacuum in which he had negotiated the whole settlement. In fact, the *909 release is just a part of that "settlement.” Estridge could not, consistent with his fiduciary obligations, have exacted this release without giving Auld the details of the sale of the business. The release is invalid, then, to the extent that it purports to insulate Estridge from liability for breach of fiduciary duty. Moreover, the release was orally conditioned on the production of $25,000 in cash, which was never produced and is, in any event, ineffective. (Stiebel v Grosberg, 202 NY 266.)
Estridge also raises the April, 1969 transaction as an "accord” in defense, even though an accord was never in fact satisfied. But, it was not Auld who violated the agreement, but rather Newport Chemical Industries, a prospective purchaser of the wood business, who was seeking the settlement. Newport added new conditions and changed the terms of the settlement Auld had presumably agreed to. Newport’s refusal to perform under the terms of the settlement left Auld free to pursue his original claim. (General Obligations Law, § 15-501, subd 3.)
VII. FINANCIAL RECAPITULATION
It will be recalled that Auld received $10,000 from the bank as a loan against the 5,000 shares of Allen he did receive. He repaid $2,000, and defaulted on the balance. Since Estridge guaranteed the bank loan, and on February 2, 1970, satisfied the debt by paying $8,547.33, he is entitled to recover this amount, plus interest, from Auld. Estridge took the 5,000 shares of Allen which Auld had originally received, so no separate account is given that transaction.
Accordingly, plaintiff may have judgment against defendant for $28,490.52, plus interest. Defendant may have judgment against plaintiff for $8,547.33, plus interest.